# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ALASKA

SHEWANDA L. JACKSON-MOTEN,

                    Plaintiff,

   vs.

NANCY A. BERRYHILL, Deputy
Commissioner of Social Security for Operations,

                    Defendant.

Case No. 3:18-cv-00135-SLG

## DECISION AND ORDER

On or about July 20, 2015, Shewanda L. Jackson-Moten filed an application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("the Act"),[1] alleging disability beginning June 6, 2009.[2]  Ms. Jackson-Moten has exhausted her administrative remedies and filed a Complaint seeking relief from this Court.[3]

Ms. Jackson-Moten filed an opening brief seeking reversal of the agency decision and remand for a *de novo* hearing and new decision.[4]  The Commissioner filed an Answer and a brief in opposition to Ms. Jackson-Moten's opening brief.[5]  Ms. Jackson-Moten did not file a reply brief.  Oral argument was not requested and was not necessary to the Court's decision.  This Court has jurisdiction to hear an appeal from a final decision of the

---

[1] The Court uses the term "disability benefits."

[2] Administrative Record ("A.R.") 15, 257–58.  The application is dated July 21, 2015.  A.R. 257–58.

[3] Docket 1 (Jackson-Moten's Compl.).

[4] Docket 13 (Jackson-Moten's Br.).

[5] Docket 11 (Answer); Docket 14 (Defendant's Br.).

Commissioner of Social Security.[6]  For the reasons set forth below, Ms. Jackson-Moten's request for relief will be granted.

## I.    STANDARD OF REVIEW

A decision by the Commissioner to deny disability benefits will not be overturned unless it is either not supported by substantial evidence or is based upon legal error.[7] "Substantial evidence" has been defined by the United States Supreme Court as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[8]  Such evidence must be "more than a mere scintilla," but may be "less than a preponderance."[9]  In reviewing the agency's determination, the Court considers the evidence in its entirety, weighing both the evidence that supports and that which detracts from the administrative law judge ("ALJ")'s conclusion.[10]  If the evidence is susceptible to more than one rational interpretation, the ALJ's conclusion must be upheld.[11]  A reviewing court may only consider the reasons provided by the ALJ in the disability determination

---

[6] 42 U.S.C. § 405(g).

[7] *Matney ex rel. Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992) (citing *Gonzalez v. Sullivan*, 914 F.2d 1197, 1200 (9th Cir. 1990)).

[8] *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

[9] *Perales*, 402 U.S. at 401; *Sorenson v. Weinberger*, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975) (per curiam).

[10] *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

[11] *Gallant v. Heckler*, 753 F.2d 1450, 1453 (9th Cir. 1984) (citing *Rhinehart v. Finch*, 438 F.2d 920, 921 (9th Cir. 1971)).

and "may not affirm the ALJ on a ground upon which [he] did not rely."[12] An ALJ's decision will not be reversed if it is based on "harmless error," meaning that the error "is inconsequential to the ultimate nondisability determination . . . or that, despite the legal error, the agency's path may reasonably be discerned, even if the agency explains its decision with less than ideal clarity."[13] Finally, the ALJ has a "special duty to fully and fairly develop the record and to assure that the claimant's interests are considered."[14] In particular, the Ninth Circuit has found that the ALJ's duty to develop the record increases when the claimant is unrepresented or is mentally ill and thus unable to protect her own interests.[15]

## II. DETERMINING DISABILITY

The Act provides for the payment of disability insurance to individuals who have contributed to the Social Security program and who suffer from a physical or mental disability.[16] In addition, SSI may be available to individuals who are age 65 or older, blind, or disabled, but who do not have insured status under the Act.[17] Disability is defined in the Act as follows:

---

[12] *Garrison v. Colvin*, 759 F.3d 995, 1010 (9th Cir. 2014).

[13] *Brown-Hunter v. Colvin,* 806 F.3d 487, 492 (9th Cir. 2015) (internal quotation marks and citations omitted).

[14] *Smolen v. Chater,* 80 F.3d 1273,1288 (9th Cir. 1996) (quoting *Brown v. Heckler,* 713 F.2d 441, 443 (9th Cir. 1983)); *see also Garcia v. Comm'r of Soc. Sec.,* 768 F.3d 925, 930 (9th Cir. 2014).

[15] *Tonapetyan v. Halter,* 242 F.3d 1144, 1150 (9th Cir. 2001).

[16] 42 U.S.C. § 423(a).

[17] 42 U.S.C. § 1381a.

[I]nability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.[18]

The Act further provides:

An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.[19]

The Commissioner has established a five-step process for determining disability within the meaning of the Act.[20] A claimant bears the burden of proof at steps one through four in order to make a prima facie showing of disability.[21] If a claimant establishes a prima facie case, the burden of proof then shifts to the agency at step five.[22] The Commissioner can meet this burden in two ways: "(a) by the testimony of a vocational

---

[18] 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

[19] 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

[20] 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

[21] *Treichler v. Comm'r Soc. Sec. Admin.*, 775 F.3d 1090, 1096 n.1 (9th Cir. 2014) (quoting *Hoopai v. Astrue*, 499 F.3d 1071, 1074–75 (9th Cir. 2007)); s*ee also Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).

[22] *Treichler*, 775 F.3d at 1096 n.1; *Tackett*, 180 F.3d at 1098 (emphasis in original).

expert, *or* (b) by reference to the Medical-Vocational Guidelines at 20 C.F.R. pt. 404, subpt. P, app. 2."[23]  The steps, and the ALJ's findings in this case, are as follows:

**Step 1.**  Determine whether the claimant is involved in "substantial gainful activity." *The ALJ concluded that Ms. Jackson-Moten had not engaged in substantial gainful activity during the period from the alleged onset date of June 6, 2009 through her date last insured of March 31, 2014.*[24]

**Step 2.**  Determine whether the claimant has a medically severe impairment or combination of impairments.  A severe impairment significantly limits a claimant's physical or mental ability to do basic work activities and does not consider age, education, or work experience.  The severe impairment or combination of impairments must satisfy the twelve-month duration requirement.  *The ALJ determined that Ms. Jackson-Moten had the following severe impairments through the date last insured: right shoulder osteoarthritis and sarcoidosis.  The ALJ found that Ms. Jackson-Moten's right lower extremity impairment; cervical, thoracic, and lumbar degenerative disc disease; hypothyroid; anemia; reflux esophagitis; major depressive disorder; generalized anxiety disorder; and post-traumatic stress disorder were non-severe.  He also found that Ms. Jackson-Moten's hand impairment, irritable bowel syndrome, fibromyalgia, and other*

---

[23] *Tackett*, 180 F.3d at 1101.

[24] A.R. 17.

*physical complaints were not medically determinable impairments with any resultant significant vocational limitations.*[25]

**Step 3.**  Determine whether the impairment is the equivalent of any of the listed impairments found in 20 C.F.R. pt. 404, subpt. P, app.1 that are so severe as to preclude substantial gainful activity.  If the impairment is the equivalent of any of the listed impairments, and meets the duration requirement, the claimant is conclusively presumed to be disabled.  If not, the evaluation goes on to the fourth step.  *The ALJ determined that through the date last insured, Ms. Jackson-Moten did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment.*[26]

Before proceeding to step four, a claimant's residual functional capacity ("RFC") is assessed.  Once determined, the RFC is used at both step four and step five.  An RFC assessment is a determination of what a claimant is able to do on a sustained basis despite the limitations from her impairments, including impairments that are not severe.[27] *The ALJ concluded that through the date last insured, Ms. Jackson-Moten had the RFC to perform light work except she was limited to occasionally climbing ramps or stairs; occasionally balancing, stooping, kneeling, crouching, and crawling; occasionally reaching overhead with the right upper extremity (above shoulder reaching) and pushing*

---

[25] A.R. 18–20.

[26] A.R. 21.

[27] 20 C.F.R. § 404.1520(a)(4).

*and pulling with right upper extremity; never climbing ladders, ropes, or scaffolds; and avoiding all exposure to irritants, such as fumes, odors, dust, and gases.*[28]

**Step 4.**  Determine whether the claimant is capable of performing past relevant work.  At this point, the analysis considers whether past relevant work requires the performance of work-related activities that are precluded by the claimant's RFC.  If the claimant can still do her past relevant work, the claimant is deemed not to be disabled.  Otherwise, the evaluation process moves to the fifth and final step.  *The ALJ found that through the date last insured, Ms. Jackson-Moten "was capable of performing past relevant work as a loan manager, tech support, and Subway manager."  The ALJ added that "[t]his work did not require the performance of work-related activities precluded by the claimant's residual functional capacity."*[29]

**Step 5.**  Determine whether the claimant is able to perform other work in the national economy in view of her age, education, and work experience, and in light of the RFC.  If so, the claimant is not disabled.  If not, the claimant is considered disabled.  *The ALJ determined that Ms. Jackson-Moten was capable of past relevant work and did not proceed to Step 5.*[30]

The ALJ concluded that Ms. Jackson-Moten was not disabled at any time from June 6, 2009, the alleged onset date, through March 31, 2014, the date last insured.[31]

---

[28] A.R. 21–22.

[29] A.R. 26.

[30] *Id.*

[31] *Id.*

### III. PROCEDURAL AND FACTUAL BACKGROUND

Ms. Jackson-Moten was born in 1977; she is 41 years old.[32] She reported working as a merchandiser for Market Connect Group from April 2011 through December 2014, but her average monthly earnings were below the threshold for presuming substantial gainful activity from June 6, 2009 through March 31, 2014.[33] In the past she also worked as a cashier clerk at Tesoro, a payday loan manager, tech support for Direct TV, and as a manager at Subway.[34] On December 2, 2015, the Social Security Administration ("SSA") determined that Ms. Jackson-Moten was not disabled under the applicable rules.[35] On January 19, 2016, Ms. Jackson-Moten timely requested a hearing before an ALJ.[36] She appeared and testified without a representative at a hearing held on March 17, 2017 before ALJ Paul Hebda.[37] On April 7, 2017, the ALJ issued an unfavorable ruling for the period from June 6, 2009, the alleged onset date, through March 31, 2014, the date last insured.[38] On April 26, 2018, the Appeals Council denied Ms. Jackson-Moten's

---

[32] A.R. 257–58.

[33] A.R. 17–18, 41–42, 271.

[34] A.R. 26, 63–64, 66–69, 259–68.

[35] A.R. 15, 161–74.

[36] A.R. 15.

[37] A.R. 15, 38–72.

[38] A.R. 12–27. Ms. Jackson-Moten filed two previous application for benefits, on March 13, 2009 and April 14, 2011. Both prior applications were denied and not appealed by Ms. Jackson-Moten. A.R. 15, 128–141. The April 14, 2011 application was denied on December 16, 2011. A.R. 141. In the ALJ decision on April 7, 2017, the ALJ noted that the December 16, 2011 decision was "*res judicata* and administratively final." He added that "[a]ny discussion of the period prior to December 16, 2011 is for background purposes only and is not an implied reopening." A.R. 15. ALJ Hebda also noted that Ms. Jackson-Moten's application of July 15, 2015 had "overcome the

request for review.[39]  Ms. Jackson-Moten timely appealed to this Court on June 12, 2018.[40]

*Medical Records*

Although Ms. Jackson-Moten's medical records date back to 2005, the Court's review of the record is primarily focused on the period from the date of the previous application denial on December 16, 2011 through the date last insured of March 31, 2014. The following are the relevant medical records:

In February 2011 and from approximately June to October 2011, Ms. Jackson-Moten sought mental health care at Anchorage Neighborhood Health Center.  Providers observed that she was alert and oriented with linear thought processes, memory intact, and speech of appropriate rate, volume, and tone to conversation.[41]

On August 4, 2011, Ms. Jackson-Moten saw Megan Engler, PAC, at Anchorage Neighborhood Health Center as a follow up from a recent emergency room visit after panic attacks.  She reported having panic attacks 2–3 times per day, lasting one to two hours.  She reported right-sided numbness that contributed to her panic.  PAC Engler

---

presumption of non-disability, as she has been diagnosed with sarcoidosis since the time of her last decision, which has been considered in this decision."  A.R. 23.

[39] A.R. 1–6.

[40] Docket 1.

[41] *See e.g.,* A.R. 342–50, 355–58.

noted that Ms. Jackson-Moten was oriented to time, place, and person with a dysthymic mood and normal affect.[42]

On October 6, 2011, Ms. Jackson-Moten reported going to the emergency room the previous day for anxiety/panic attack symptoms. She reported taking "hydroxyzine only occasionally as needed."[43]

On February 24, 2014, Ms. Jackson-Moten saw Ronald Christensen, M.D., a family practitioner, for a consultative evaluation. She reported her "main complaint" on that day was "multi-joint arthralgias involving her neck, shoulders, low back, right hip and leg, and specifically her right foot." On physical examination, Dr. Christensen observed that Ms. Jackson-Moten's lungs were clear with no wheezing, rales, or rhonchi. Dr. Christensen also observed that Ms. Jackson-Moten had good range of motion in her hips, knees, elbows, wrists, and hands, but "slightly limited range of motion" in the cervical spine and shoulders and pain "at the extremes of range of motion." He noted that Ms. Jackson-Moten "could not stand on her right toes," but could balance on each foot and do "nearly a full squat." Dr. Christensen noted that Ms. Jackson-Moten had 5/5 motor strength and a coordinated gait, but it was "antalgic favoring the right leg." He also noted an "intermittent tremor of her right hand." He assessed Ms. Jackson-Moten with a history

---

[42] A.R. 351–52.

[43] A.R. 344. At a pre-hearing conference on October 28, 2016, Ms. Jackson-Moten notified the Senior Attorney at ODAR that she did not have health insurance or a primary care provider for most of the time period from December 16, 2011 through the date last insured of March 31, 2014. She stated she went to the emergency room for her health care. Ms. Jackson-Moten was not under oath at the pre-hearing conference. A.R. 81–83, 88, 91.

of multi-joint arthralgia "of unclear etiology"; neck pain with a normal x-ray of the cervical spine; chronic low back pain; history of depression that was currently untreated; history of irritable bowel syndrome; and right foot pain with "underlying degenerative joint disease at the first metatarsophalangeal joint and bilateral pes planus." Dr. Christensen opined that Ms. Jackson-Moten was "generally functional in her activities of daily living insomuch as she could get on and off the exam table and perform all of the physical examination tasks." He opined that she appeared "to be capable of at least light activity."[44]

On February 28, 2014, Ms. Jackson-Moten saw Kathleen Michaud, Ph.D., for a psychological evaluation. Dr. Michaud diagnosed Ms. Jackson-Moten with posttraumatic stress disorder (PTSD); major depressive disorder, recurrent, severe; and generalized anxiety disorder. Dr. Michaud rated Ms. Jackson-Moten's Global Assessment of Functioning score as 45. She observed that Ms. Jackson-Moten was well-groomed; her speech was of normal rate and tone and was logical and coherent; she made good eye contact; her mood was dysthymic and affect appropriate. Dr. Michaud also noted that Ms. Jackson-Moten was oriented to person, place, time, and situation and appeared to be of average intelligence or higher with concentration, abstract thinking, working memory, expressive and receptive language intact, but with mildly impaired rote and short-term memory. Her long-term memory appeared intact and her insight and judgment were good. Ms. Jackson-Moten reported that she got up and went to work on some days. She reported that on the days she did not work she would "sit around the house, read on

---

[44] A.R. 401–04.

my kindle, and wait until the kids come home, feed my son, and go to bed at 4 or 5pm."

She reported being able to bath and dress on her own; drive; shop for herself "if she's only buying for one meal;" and could participate in childcare and take care of her finances "although her husband [took] care of money matters." Dr. Michaud also noted that Ms. Jackson-Moten had participated in "limited psychotherapy, and currently does not take medications she is prescribed as she does not like the side effects, and it appears she has some fear of misusing medication as a means of self-harm, although she denied current suicidal ideation." Dr. Michaud opined that Ms. Jackson-Moten met the criteria for posttraumatic stress disorder, major depressive disorder, and generalized anxiety disorder.[45]

On March 14, 2014, Laura Jones, a state agency reviewing psychologist, opined that Ms. Jackson-Moten had a mild restriction of her activities of daily living; moderate difficulties maintaining social functioning; mild difficulties maintaining concentration, persistence, or pace; and no episodes of decompensation.[46]

On April 15, 2015, Ms. Jackson-Moten saw Gregory Gerboth, M.D., a pulmonologist. Dr. Gerboth noted that Ms. Jackson-Moten had "a new significant enlargement of her hilar on chest x-ray with changes that are certainly most consistent with sarcoidosis, but the pain she is experiencing seems to be somewhat disproportioned to what we may expect to see with sarcoidosis, as this is typically [ ] something that does

---

[45] A.R. 405–13.

[46] A.R. 152–53.

not cause a lot of pain."  On physical examination, Dr. Gerboth did not "hear any wheezing," although he noted "a definite loud rasp that almost sounds like stridors."  Dr. Gerboth scheduled a CT scan.[47]

On April 16, 2015, Ms. Jackson-Moten had a CT scan of the chest.  The CT scan showed "[b]ilateral hilar, subcarinal, and superior mediastinal adenopathy, likely sarcoidosis or lymphoma."[48]

On May 1, 2015, Ms. Jackson-Moten had a biopsy of the right lower lobe of the lung.  The pathology report's final diagnosis was "[b]ronchial mucosa with focal granuloma suspicious but not diagnostic of sarcoidosis; special stains are negative for microorganisms; recommend clinical correlation."[49]

On July 29, 2015, Ms. Jackson-Moten had a lower third esophagus biopsy.  The biopsy showed "[m]ildly hyperplastic squamous esophageal mucosa consistent with reflux esophagitis."[50]  On August 3, 2015, Ms. Jackson-Moten was diagnosed with reflux esophagitis (GERD).[51]

On August 17, 2015, Ms. Jackson-Moten saw Tonya Caylor, M.D., at Hillside Family Medicine.  Dr. Caylor prescribed Zoloft for anxiety.  She also noted that "[o]nce Dr.

---

[47] A.R. 414.

[48] A.R. 417, 507.

[49] A.R. 505.

[50] A.R. 509.

[51] A.R. 418.

Gerboth has your sarcoid controlled on another medication, you may be able to wean off the Prednisone which will also likely help your anxiety and panic attacks."[52]

On August 28, 2015, Ms. Jackson-Moten had a chest x-ray. The x-ray showed "[n]o active disease" and "[p]erihilar and mediastinal adenopathy, slightly decreased from the prior study."[53]

On December 1, 2015, Ron Feigin, M.D., a state agency reviewing physician, provided a mental RFC assessment as of Ms. Jackson-Moten's date last insured of March 31, 2014. He opined that Ms. Jackson-Moten was moderately limited in her ability to understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods; work in coordination or proximity to others; complete a normal workday without interruptions from psychologically based symptoms; and perform at a consistent pace. Dr. Feigin opined that Ms. Jackson-Moten was also moderately limited in her ability to accept instructions and respond appropriately to criticism; get along with coworkers; and respond appropriately to changes in the work setting.[54]

On March 24, 2016, Ms. Jackson-Moten went to the emergency department at Alaska Regional Hospital. She reported a "productive cough, generalized malaise, and a headache that began 2 days ago." She also reported that she stayed "at home usually,

---

[52] A.R. 416.

[53] A.R. 501.

[54] A.R. 169–71.

but assisted her husband delivering newspapers for the last several days." On physical examination, Ms. Jackson-Moten had normal breath and heart sounds; was alert and oriented to person, place, and time; and had a normal mood and affect. Ms. Jackson-Moten was diagnosed with bronchitis and prescribed Tylenol, prednisone for five days, and azithromycin. Ms. Jackson-Moten also had a chest x-ray taken. The x-ray showed an "[i]nterval increase in right paratracheal and bilateral perihilar adenopathy. The pattern and distribution [are] consistent with the clinical diagnosis of sarcoidosis. No evidence of acute cardiopulmonary disease."[55]

On March 6, 2017, Ms. Jackson-Moten saw Linda Pope, M.D., at Providence Health & Services. Dr. Pope prescribed an albuterol inhaler, a fluticasone-salmeterol inhaler, azithromycin, as well as hydrocodone-acetaminophen (Norco).[56]

*Hearing Testimony on March 17, 2017*

Ms. Jackson-Moten attended a hearing before ALJ Hebda on March 17, 2017 without an attorney or other representative.[57] The ALJ notified her that the time period Ms. Jackson-Moten needed to establish disability was from December 16, 2011 to March

---

[55] A.R. 428–35, 508.

[56] A.R. 498–500. Azithromycin is used to treat a wide variety of bacterial infections. *See https://www.webmd.com/drugs/2/drug-1527-3223/azithromycin-oral/azithromycin-250-500-mg-oral/details.*

[57] Ms. Jackson-Moten also attended a pre-hearing conference with the Senior Attorney at ODAR without representation on October 28, 2016. A.R. 74–95. At the pre-hearing conference, Ms. Jackson-Moten notified the Senior Attorney at ODAR that she initiated care with Dr. Pope to establish Dr. Pope as a primary care provider. A.R. 90–91; *see also* A.R. 49, 53.

31, 2014.[58]  The ALJ also notified Ms. Jackson-Moten that she had been informed of her right to representation at a prehearing conference on October 28, 2016.[59]  Ms. Jackson-Moten testified that she had worked at Tesoro as a cashier clerk, Subway as crew and as a manager, telephone technical support for Direct TV, and as a payday loan manager. She also reported working for Market Connect Group in 2013 and 2014.  Ms. Jackson-Moten testified that she had a driver's license and drove herself to the hearing.  She testified that she needed some help dressing and with the shower and bath, that her children did the housework, but she would try to vacuum the floor.  She reported for "almost a year" she had been restricted to her bed due to hip pain.  Ms. Jackson-Moten testified that she had adverse effects from some of her medications and she was "exhausted no matter what."  She also stated she had breathing problems and "every time I [go] outside I get sick, or if I smell cigarettes then I'm really sick.  If someone is smoking by a door and I inhale any of it then it causes me really bad breathing problems."  Ms. Jackson-Moten also testified that she had anxiety "from the breathing problem, because when I feel like I can't breathe I start to panic and I start running around, and its not . . . it's not [appropriate in a] workplace environment."  She testified that she had sarcoidosis in her eyes and had sarcoidosis arthritis, which had been "ongoing for years now," but that she had been "misdiagnosed quite few times [in the past] because I didn't have health insurance."   Ms. Jackson-Moten also testified that she had stopped taking prescribed

---

[58] A.R. 39.

[59] A.R. 39, 77–80.

psychiatric medications because "the anxiety, it never got better and . . . nothing worked."[60]

Harvey Alpern, M.D., testified as a medical expert based on his review of the records. He identified Ms. Jackson-Moten's medically determinable impairments, but he opined that they did not meet or equal a listing. He opined initially that Ms. Jackson-Moten was capable of sitting, standing, and walking six out of eight hours, but revised his opinion for standing and walking to two out of eight hours based on Ms. Jackson-Moten's testimony that she had received a shot in both hips in the past year "which didn't work." Dr. Alpern also opined that Ms. Jackson-Moten could lift 20 pounds occasionally; 10 pounds frequently; "occasionally postural, all of them"; occasionally lift overhead on the right side; occasionally push and pull with the right upper extremity; never climb ropes or ladders; and "no concentrated dust, fumes, or irritants." He testified that his opinions applied to the time period before March of 2014.[61]

Colette Valette, a clinical psychologist, also testified as a medical expert based on her record review. She reported that Ms. Jackson-Moten had major depressive disorder, recurrent; generalized anxiety disorder; and post-traumatic stress disorder. The ALJ directed Dr. Valette to focus her opinion on the period from December 17, 2011 to March 2014. Dr. Valette testified that Ms. Jackson-Moten's mental health impairments did not

_____

[60] A.R. 40–43, 49, 56–65.

[61] A.R. 43–51. Even though Dr. Alpern altered his standing and walking opinion based on Ms. Jackson-Moten's testimony that she had received hip injections during the year prior to the hearing, he did not explain how those injections applied to the time period before March 2014 nor was he asked by the ALJ to explain his revised opinion. A.R. 48–49.

meet or equal any of the listings. She opined that Ms. Jackson-Moten had mild limitations understanding, remembering, or applying information; no limitations interacting with others; no limitations with concentrating, persisting, or maintaining pace; and mild limitations adapting and managing herself. Dr. Valette noted that Ms. Jackson-Moten could perform her daily activities, including driving, paying bills, working on the computer, and taking care of her children. She also noted that in 2011, Ms. Jackson-Moten had a "remote history of being noncompliant with her medications."[62]

William Weiss testified as the vocational expert. He noted that, based on the ALJ's hypothetical of light work with limitations, including "avoidance of all irritants such as fumes, odors, dusts," Ms. Jackson-Moten would be capable of her past work as a payday loan manager or similar position because "it's indoor work" so she would not "have to deal with any dusts, gasses, et cetera" and "the only thing that would preclude the past work would be possibly to include cologne and perfume, but that would be the only issue." Ms. Jackson-Moten also questioned Mr. Weiss. She asked if an employee with "problems with the dust, and the cologne, and the cigarettes, and things like that" would be employable. Mr. Weiss responded that "typically workplaces do not allow smoking" and if the individual was "a supervisor" he or she could ask employees not to wear cologne or perfume. When Ms. Jackson-Moten asked Mr. Weiss about smoking outside the premises that is "still within the premises or very close to," Ms. Weiss answered that

---

[62] A.R. 52–57.

"typically that's not allowed in the premises" and "I don't know, I'm not a physician . . . I couldn't really respond."[63]

## IV.    DISCUSSION

Ms. Jackson-Moten is represented by counsel.  In her opening brief, Ms. Jackson-Moten asserts that the ALJ: (1) "erred at step two to the extent [he] found anxiety not severe . . . with respect to her past relevant work environments"; (2) erred at step four "because sarcoidosis prevents Ms. Moten from returning to past relevant work"; and (3) failed to "fully and fairly develop the record generally, and with particular focus on the environmental conditions of Ms. Moten's past relevant work."[64]   The Commissioner disputes Ms. Jackson-Moten's assertions.[65]  The Court will address each of Ms. Jackson-Moten's assertions in turn:

A.  Development of the Record and the ALJ's Step Two Analysis

Ms. Jackson-Moten asserts that the ALJ did not fully and fairly develop the record. Specifically, she argues that the ALJ failed to fully and fairly develop the record "with particular focus on the environmental conditions of Ms. Moten's past relevant work."[66] Additionally, she alleges that the ALJ erred in finding that Ms. Jackson-Moten's anxiety was not severe at Step Two of his disability analysis "with respect to her past relevant

---

[63] A.R. 68–71.

[64] Docket 13 at 1–13.

[65] Docket 14 at 2–8.

[66] Docket 13 at 10.

work environments."[67]  The Commissioner argues that because the agency "ordered two consultative examinations in order to obtain objective evidence about the severity of [Ms. Moten-Jackson]'s physical and mental impairments," the duty to develop the record was satisfied.[68]

    1.  *Legal Standard.*

The ALJ has an "independent 'duty to fully and fairly develop the record and to assure that the claimant's interests are considered.'"[69]  An "ALJ's duty to develop the record further is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence."  Additionally, the "ALJ must be especially diligent when the claimant is unrepresented or has only a lay representative."[70]  The Social Security regulations define severe impairment as an impairment which significantly limits a claimant's "ability to do basic work activities."[71]  Further, to be severe, the impairment must "result from anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques."[72]

---

[67] Docket 13 at 5–6, 9–10.

[68] Docket 14 at 7.

[69] *Tonapetyan v. Halter,* 242 F.3d 1144, 1150 (9th Cir. 2001).

[70] *McLeod v. Astrue,* 640 F.3d 881, 885 (9th Cir. 2011).

[71] 20 C.F.R. §§ 404.1521; *see also Webb v. Barnhart,* 433 F.3d 683, 687 (9th Cir. 2005) (an ALJ must have substantial evidence to find that the medical evidence clearly establishes that the claimant lacks a medically severe impairment or combination of impairments).

[72] 20 C.F.R. §§ 404.1521.

### 2. *Analysis*

In his decision, ALJ Hebda found Ms. Jackson-Moten's right shoulder osteoarthritis and sarcoidosis were severe during the time period between December 2011 and March 31, 2014. He determined that Ms. Jackson-Moten's major depressive disorder, generalized anxiety disorder, post-traumatic stress disorder, and all other medically determinable physical impairments were non-severe.[73] The ALJ considered Ms. Jackson-Moten's testimony regarding her activities of daily living and determined that "[o]verall, the evidence, such as [Ms. Jackson-Moten's] ability to drive, perform some work activity through 2014, and help her husband deliver newspaper[s], is not consistent with the alleged severity of her limitations."[74] Ms. Jackson-Moten's RFC did not include any limitations due to mental impairments, but the ALJ limited Ms. Jackson-Moten to avoiding "all exposure to irritants, such as fumes, odors, dusts, and gases."[75]

Even though the ALJ found Ms. Jackson-Moten's anxiety non-severe at Step Two, he had a duty to consider the combined effect of all of Ms. Jackson-Moten's impairments.[76] However, ALJ Hebda did not consider whether Ms. Jackson-Moten's mental impairments, specifically anxiety, combined with a delayed diagnosis of

---

[73] A.R. 18–20.

[74] A.R. 26.

[75] A.R. 20–21.

[76] A.R. 20; *see Smolen v. Chater,* 80 F.3d 1273, 1290 (An ALJ "must consider the combined effect of all of the claimant's impairments on her ability to function, without regard to whether each alone was sufficiently severe.").

sarcoidosis, could have been disabling.[77] At the March 17, 2017 hearing, Ms. Jackson-Moten testified that she "[had been] misdiagnosed quite a few times because I didn't have health insurance . . . [b]ut later on I find out it's something else, it's the sarcoidosis arthritis . . [s]o this has been . . . ongoing for years now."[78] Although not under oath, Ms. Jackson-Moten notified the Senior Attorney at ODAR at a pre-hearing conference that she did not have health insurance or a primary care provider for most of the relevant time period from December 16, 2011 to March 31, 2014 and that she went to the emergency room for health care during that time.[79] She also testified that "anxiety factors into her breathing impairment . . . because when I feel like I can't breathe I start to panic and I start running around and it's not — it's not workplace environment. I couldn't go to work and run around like that…."[80]

Because the ALJ acknowledged Ms. Jackson-Moten's sarcoidosis was a severe medically determinable impairment, "all medically determinable impairments must be considered in the remaining steps of the sequential analysis."[81] ALJ Hebda should have developed the record regarding whether the combination of Ms. Jackson-Moten's mental impairments and sarcoidosis could have been disabling during the relevant time period

---

[77] A.R. 21–22; *see also Smolen v. Chater,* 80 F.3d 1273, 1290 (9th Cir. 1996) (An ALJ "must consider the combined effect of all of the claimant's impairments on her ability to function, without regard to whether each alone was sufficiently severe.").

[78] A.R. 49–50.

[79] A.R. 81–83, 88, 91.

[80] A.R. 65.

[81] *Orn v. Astrue,* 495 F.3d 625, 630; *see also* 42 U.S.C. § 423(d)(2)(B).

from June 6, 2009 through March 31, 2014.[82]

Ms. Jackson-Moten also correctly points out that the ALJ should have explained the meaning of "date last insured" to her at the March 17, 2017 hearing.[83] However, this error alone is harmless.[84] But, because the ALJ here "failed to set forth the reasoning behind [his] decisions in a way that allows for meaningful review," the ALJ will also have the opportunity to correct this error at a new hearing. [85]

In light of the reasons set forth above, the Court finds that the ALJ failed to fully and fairly develop the record.

B. The ALJ's Step Four Analysis

Ms. Jackson-Moten alleges that the ALJ erred at Step Four in his five-step process for determining disability. She alleges that the ALJ did not "address her past work

---

[82] *Carmickle v. Comm'r Soc. Sec. Admin.,* 533 F.3d 1155, 1164 (9th Cir. 2008); *see also* SSR 96-8p ("In assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'").

[83] Ms. Jackson-Moten cites the following exchange between the ALJ and herself at the March 17, 2017 hearing:

> ALJ: Okay. And as I mentioned earlier we have a cutoff date of March of 2014, because that is your date last insured. Okay?
> CLMT: What do you mean last insured?
> ALJ: I'll explain that to you when we finish with the doctor. And I forgot to mention to you, Doctor, as well. The date last insured is March of 2014…. A.R. 48–49.

There is no indication in the record of the March 2017 hearing that the ALJ explained the concept of "date last insured" to Ms. Jackson-Moten.

[84] The ALJ directed the testifying experts to confine their testimony to the period from December 17, 2011 and March 2014 and considered Ms. Jackson-Moten's testimony regarding her work activities during the relevant time period. A.R. 26, 49, 53.

[85] Docket 13 at 11–12; *see also Brown-Hunter v. Colvin,* 806 F.3d 487, 492 (9th Cir. 2015).

environments" and incorrectly presumed that her past work environments were "irritant free" based on a "determination that Mr. Weiss's speculative notions about past relevant work conditions should be preferred over the first-person testimony of Ms. Moten who actually worked in those past relevant working environments."[86]   The Commissioner argues that the ALJ "correctly excluded possible accommodations from his residual functional capacity and step four assessments."[87]   Additionally, the Commissioner asserts that "a medical restriction to avoid excessive amounts [of] fumes, etc., has a 'minimal' impact [on] a claimant's ability to do work because 'most job environments do not involve great . . . amounts of dust, etc.'"[88]

### 1. *Legal Standard*

At Step Four of an ALJ's disability determination process, "claimants have the burden of showing that they can no longer perform their past relevant work."[89]   However, the ALJ "still has a duty to make the requisite factual findings to support his conclusion."[90] "This is done by looking at the 'residual functional capacity and the physical and mental demands' of the claimant's past relevant work" and the relation of the RFC to the past

---

[86] Docket 13 at 6–9.

[87] Docket 14 at 6.

[88] Docket 14 at 6 (citing SSR 85–15, 1985 WL 56857, at *8).

[89] 20 C.F.R. § 404.1520(e); *Clem v. Sullivan,* 894 F.2d 328, 330 (9th Cir. 1990).

[90] *Pinto v. Massanari,* 249 F.3d 840, 844 (9th Cir. 2001) (The finding by the ALJ that claimant could perform her past relevant work as a hand packager in a food cannery, despite being illiterate in English, and being unable to stoop, climb, or balance "more than occasionally" due to her physical impairments, was not supported by the administrative record.) (citing SSR 82-62).

work. However, in the Ninth Circuit, courts have "never required explicit findings at step four regarding a claimant's past relevant work both as generally performed *and* as actually performed."[91]

2. *Analysis*

Here, the ALJ found that Ms. Jackson-Moten had severe impairments of right shoulder osteoarthritis and sarcoidosis. Based thereon, ALJ Hebda concluded that Ms. Jackson-Moten could perform light work with exceptions, including avoiding "all exposure to irritants, such as fumes, odors, dusts, and gases." Comparing the RFC with the physical and mental demands of her past work, the ALJ determined Ms. Jackson-Moten was able to perform her past work as generally performed. He relied on the testimony of the vocational expert to determine that "a person with [Ms. Jackson-Moten]'s current residual functional capacity could perform the payday loan manager, tech support, and Subway manager positions."[92]

First, the RFC is an individual's "maximum remaining ability to do sustained work-related physical and mental activities in an ordinary work setting on a regular and continuing basis," and "must include a discussion of the individual's abilities on that basis."[93] Ms. Jackson-Moten asserts that the RFC in her case "effectively precludes past

---

[91] *Id.* at 844–45; 20 C.F.R. § 404.1520(e).

[92] A.R. 18–26, 68–71.

[93] SSR 96-8p at *2 (emphasis omitted).

relevant work" to the extent it "precludes 'all exposure to irritants, such as fumes, odors, dusts, and gases.'"[94]  Specifically, Ms. Jackson-Moten emphasizes that, per SSR 85-15:

> Where a person has a medical restriction to avoid excessive amounts of noise, dust, etc., the impact on the broad world of work would be minimal because most job environments do not involve great noise, amounts of dust, etc.
>
> [But] [w]here an individual can tolerate very little noise, dust, etc., the impact on the ability to work would be considerable because very few job environments are entirely free of irritants, pollutants, and other potentially damaging conditions.[95]

The Dictionary of Occupational Titles ("DOT") and Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles ("SCO") describe Ms. Jackson's past jobs of payday loan manager (DOT 241.137-010), tech support (DOT 952.364-010), and Subway manager (DOT 185.137-010).  For each of these jobs, the "atmospheric conditions"[96] are described as "Not Present — Activity or condition does not exist."[97]  However, Ms. Jackson-Moten argues that she would still be exposed to tobacco smoke wafting in from outside her work environments.

Upon questioning at the hearing by Ms. Jackson-Moten, Mr. Weiss did not fully address the effect of smoking or other odors on Ms. Jackson-Moten's combination of

---

[94] Docket 13 at 9.

[95] SSR 85-15.

[96] The category "atmospheric conditions" is described in the SCO as "[e]xposure to such conditions as fumes, noxious odors, dusts, mists, gases, and poor ventilation, that affect the respiratory system, eyes, or the skin."  SCO Appendix D at D-2.

[97] See DICOT 241.137-010, 1991 WL 672238; DICOT 952.364-010, 1991 WL 688342; and DICOT 185.137-010, 1991 WL 671285.

physical and mental impairments. Specifically, when asked by Ms. Jackson-Moten about smoking outside work premises, Mr. Weiss answered, "typically [smoking is] not allowed in the premises" and "I don't know, I'm not a physician . . . I couldn't really respond."[98]

This is a factual matter that could potentially prevent Ms. Jackson-Moten from continuing her past work as actually performed or generally performed.[99] Given his reliance on Mr. Weiss's testimony and the ALJ's own determination that Ms. Jackson-Moten should avoid "all exposure to irritants, such as fumes, odors, dusts, and gases," the ALJ was not free to ignore the potential effect of smoking or other irritants in the work environment on Ms. Jackson-Moten's ability to perform her past relevant work.[100]

Because the ALJ did not consider smoke or other odors despite determining Ms. Jackson-Moten must avoid all exposure to them, the ALJ's Step Four determination lacks adequate factual findings and is not supported by substantial evidence. Accordingly, remand for further proceedings on this basis is also warranted.

---

[98] A.R. 68–71.

[99] This inquiry is not the same as considering accommodations to perform past work. *See* SSR 11-2p ("When we determine whether a person can perform his or her past relevant work, we do not consider potential accommodations unless his or her employer actually made the accommodation.") Although SSR 11-2p deals with whether a "young adult" (ages 18 to 25) are disabled under the rules, the SSA uses "the same definition for disability as we do for other adults." SSR 11-2p. *See also Cleveland v. Policy Management Systems Corp.,* 526 U.S. 795, 803 (1999) ("when the SSA determines whether an individual is disabled for SSDI purposes, it does *not* take the possibility of "reasonable accommodation" into account, nor need an applicant refer to the possibility of reasonable accommodation when she applies for SSDI.").

[100] A.R. 21–22.

C.    Scope of Remand

The "ordinary remand rule" applies to disability cases.  Under this rule, if "the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation."[101]  Here, the Court has found that the ALJ's analysis at Step Four was not supported by substantial evidence and the ALJ did not fully and fairly develop the record.  Further, Ms. Jackson-Moten's requested remedy is to "reverse the final agency decision and remand to the agency" for a *de novo* hearing and new decision.[102]  Therefore, the case will be remanded for a new hearing and decision.

## V.  ORDER

The Court, having carefully reviewed the administrative record, finds that the ALJ's determinations are not free from legal error.  Accordingly, IT IS ORDERED that Ms. Jackson-Moten's request for relief at Docket 13 is GRANTED, the Commissioner's final decision is VACATED, and the case is REMANDED to the SSA for further proceedings consistent with this decision.

---

[101] *Treichler,* 775 F.3d at 1099 (quoting *Fla. Power & Light Co. v. Lorion,* 470 U.S. 729, 744 (1985)).

[102] Docket 13 at 13.

The Clerk of Court is directed to enter a final judgment accordingly.

DATED this 22nd day of March 2019 at Anchorage, Alaska.


/s/ Sharon L. Gleason
UNITED STATES DISTRICT JUDGE